ORAL ARGUMENT NOT YET SCHEDULED

No. 22-7118

IN THE

# United States Court of Appeals
# for the District of Columbia Circuit

EIG ENERGY FUND XIV, L.P., *et al.*,

Plaintiffs-Appellees,

v.

PETRÓLEO BRASILEIRO S.A.,

Defendant-Appellant,

ODEBRECHT, S.A., *et al.*,

Defendants.

On Appeal from the United States District Court
for the District of Columbia
No. 1:16-cv-00333-APM
District Judge Amit P. Mehta

## FINAL OPENING BRIEF FOR APPELLANT
## PETRÓLEO BRASILEIRO S.A.

N. THOMAS CONNALLY
CHRISTOPHER T. PICKENS
HOGAN LOVELLS US LLP
8350 Broad Street, 17th Floor
Tysons, VA 22102
(703) 610-6100

SEAN MAROTTA
PATRICK C. VALENCIA
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-4881
sean.marotta@hoganlovells.com

June 2, 2023

*Counsel for Petróleo Brasileiro S.A.*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A.     PARTIES**

1.     The following are parties in the District Court and this Court:

a.     <u>Plaintiffs-Appellees</u>:  EIG Energy Fund XIV, L.P.; EIG Energy Fund XIV-A, L.P.; EIG Energy Fund XIV-B, L.P.; EIG Energy Fund XIV (Cayman), L.P.; EIG Energy Fund XV, L.P.; EIG Energy Fund XV-A, L.P.; EIG Energy Fund XV-B, L.P.; and EIG Energy Fund XV (Cayman), L.P.

b.     <u>Plaintiff</u>:  EIG Management Company, LLC.

c.     <u>Defendant-Appellant</u>:  Petróleo Brasileiro S.A.

d.     <u>Defendants</u>:  Odebrecht, S.A.; Odebrecht Participaes e Engenharia S.A.; Keppel Corporation Ltd.; Keppel Offshore & Marine Ltd.; Sembcorp Industries Ltd.; Sembcorb Marine Ltd.; and Jurong Shipyard PTE Ltd.

2.     Petróleo Brasileiro S.A. (Petrobras) is a publicly held company specializing in the oil, natural gas, and energy industries.  It has investments in the exploration and production, refining, marketing, transportation, petrochemicals, oil product distribution, natural gas, electricity, chemical-gas, and biofuel segments.  Petrobras has no parent company, and no publicly held corporation owns 10% or more of its shares.  The Brazilian Federal Government owns 50.26% of the ordinary shares of Petrobras.

## B.    RULINGS UNDER REVIEW

Petrobras appeals the District Court's August 8, 2022, order denying

Petrobras's motion for summary judgment and granting in part Plaintiffs' motion

for summary judgment.  *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro S.A.*,

621 F. Supp. 3d 30 (D.D.C. 2022) (Mehta, J.).

## C.    RELATED CASES

This Court previously reviewed appeals in this case on two occasions, first

after the District Court denied Petrobras's motion to dismiss for lack of subject

matter jurisdiction because of its sovereign immunity, *EIG Energy Fund XIV, L.P.*

*v. Petroleo Brasileiro, S.A.*, 894 F.3d 339 (D.C. Cir. 2018), and again after the

District Court denied Petrobras's motion to stay proceedings pending arbitration,

*EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*, No. 19-7101, 2020 WL

283523 (D.C. Cir. Jan. 16, 2020) (per curiam).

/s/ Sean Marotta
Sean Marotta

# TABLE OF CONTENTS

<u>Page</u>

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

TABLE OF AUTHORITIES ................................................................................v

GLOSSARY........................................................................................................x

JURISDICTIONAL STATEMENT ..........................................................1

INTRODUCTION .................................................................................2

ISSUES PRESENTED FOR REVIEW ....................................................5

PERTINENT STATUTES.......................................................................6

STATEMENT OF THE CASE................................................................6

SUMMARY OF ARGUMENT ..............................................................15

STANDARD OF REVIEW ...................................................................18

ARGUMENT ......................................................................................19

    I.    THE DISTRICT COURT SHOULD HAVE GRANTED PETROBRAS
          SUMMARY JUDGMENT BECAUSE EIG, AND OTHER POTENTIAL
          U.S. INVESTORS, TARGETED PETROBRAS SEEKING TO INVEST
          IN SETE, NOT THE OTHER WAY AROUND ................................................21

          A.    Petrobras's actions in responding to EIG and other
                    investors' inquiries about investing in Sete do not
                    constitute "targeting" under EIG II................................21

          B.    In any case, any targeting of U.S. investors other than
                    EIG is irrelevant because EIG's claims are not "based
                    upon" representations to those investors........................31

    II.    EVEN IF PETROBRAS TARGETED EIG OR OTHER U.S.
          INVESTORS, ANY EFFECT FELT IN THE UNITED STATES WAS
          NOT AN IMMEDIATE CONSEQUENCE OF PETROBRAS'S
          CONDUCT AND THEREFORE WAS NOT A DIRECT EFFECT.........................38

## TABLE OF CONTENTS—Continued

Page

III.  AT THE VERY LEAST, THE COURT SHOULD REVERSE THE
DISTRICT COURT'S GRANT OF SUMMARY JUDGMENT TO EIG
ON THE MERITS BECAUSE THE DISTRICT COURT CANNOT
REACH THE MERITS BEFORE ITS JURISDICTION IS CERTAIN......................44

IV.  THIS COURT HAS JURISDICTION OVER PETROBRAS'S APPEAL
BECAUSE PETROBRAS DOES NOT CHALLENGE THE DISTRICT
COURT'S FACTUAL DETERMINATIONS........................................................46

CONCLUSION...................................................................................................47

CERTIFICATE OF COMPLIANCE

ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

Cases:

*Abi Jaoudi & Azar Trading Corp. v. Cigna Worldwide Ins. Co.*,
    391 F. App'x 173 (3d Cir. 2010) ........................................................ 25

\* *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
    813 F.3d 98 (2d Cir. 2016).................................................... 22, 23, 30, 33, 34, 35

*Barham v. Salazar*,
    556 F.3d 844 (D.C. Cir. 2009) ............................................................... 6

*Behrens v. Pelletier*,
    516 U.S. 299 (1996) ...................................................................... 19, 46

*Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*,
    734 F.3d 1175 (D.C. Cir. 2013) ......................................................... 20

*Calphalon Corp. v. Rowlette*,
    228 F.3d 718 (6th Cir. 2000)......................................................... 26, 27

\* *Cruise Connections Charter Mgmt. 1, LP v. Attorney General of Canada*,
    600 F.3d 661 (D.C. Cir. 2010) ........................................................ 40, 41

*De Csepel v. Republic of Hungary*,
    169 F. Supp. 3d 143 (D.D.C. 2016) .............................................. 37, 40

*Dentons US LLP v. Republic of Guinea*,
    410 F. Supp. 3d 194 (D.D.C. 2019) .................................................... 45

*Dominguez v. UAL Corp.*,
    666 F.3d 1359 (D.C. Cir. 2012) ......................................................... 39

*EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro S.A.*,
    246 F. Supp. 3d 52 (D.D.C. 2017) ..................................................... 12

\* Authorities upon which we chiefly rely are marked with an asterisk.

v

## TABLE OF AUTHORITIES—Continued

Page

\* *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*,
   894 F.3d 339 (D.C. Cir. 2018) ......................... 2, 12, 13, 17, 19, 20, 32, 36, 37, 39

\* *Federal Ins. Co. v. Richard I. Rubin & Co.*,
   12 F.3d 1270 (3d Cir. 1993).................................................... 33, 34, 35

*Fry v. Napoleon Cmty.*,
   580 U.S. 154 (2017) ............................................................. 32

*Gilda Marx, Inc. v. Wildwood Exercise, Inc.*,
   85 F.3d 675 (D.C. Cir. 1996) ................................................... 44

*Global Tech., Inc. v. Yubei (XinXiang) Power Steering Sys. Co.*,
   807 F.3d 806 (6th Cir. 2015)................................................... 33

*Goodman Holdings v. Rafidain Bank*,
   26 F.3d 1143 (D.C. Cir. 1994) ................................................. 33

*Gould, Inc. v. Mitsui Min. & Smelting Co.*,
   947 F.2d 218 (6th Cir. 1991)................................................... 36

*Guevara v. Republic of Peru*,
   608 F.3d 1297 (11th Cir. 2010).................................................. 25

*Hansen v. PT Bank Negara Indonesia (Persero)*,
   706 F.3d 1244 (10th Cir. 2013).................................................. 19

*Hood v. American Auto Care, LLC*,
   21 F.4th 1216 (10th Cir. 2021) ............................................. 35, 36

*I.T. Consultants, Inc. v. Republic of Pakistan*,
   351 F.3d 1184 (D.C. Cir. 2003) ................................................. 45

*International Techs. Consultants, Inc. v. Euroglas S.A.*,
   107 F.3d 386 (6th Cir. 1997)................................................... 26

vi

**TABLE OF AUTHORITIES—Continued**

Page

*Johnson v. Jones*,
   515 U.S. 304 (1995) ......................................................................... 46

*Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*,
   115 F.3d 1020 (D.C. Cir. 1997) ................................................. 2, 47

*LAK, Inc. v. Deer Creek Enters.*,
   885 F.2d 1293 (6th Cir. 1989) ....................................................... 26

*LNS Enters. LLC v. Continental Motors, Inc.*,
   22 F.4th 852 (9th Cir. 2022) ........................................................... 27

*McKesson HBOC, Inc. v. Islamic Republic of Iran*,
   271 F.3d 1101 (D.C. Cir. 2001) ..................................................... 37

*National R.R. Passenger Corp. v. ExpressTrak, L.L.C.*,
   330 F.3d 523 (D.C. Cir. 2003) ....................................................... 44

*OBB Personenverkehr AG v. Sachs*,
   577 U.S. 27 (2015) ................................................................... 19, 32

*Ortiz v. Jordan*,
   562 U.S. 180 (2011) ....................................................................... 46

* *Phillips v. Prairie Eye Ctr.*,
   530 F.3d 22 (1st Cir. 2008) ............................................................ 26

*Price v. Socialist People's Libyan Arab Jamahiriya*,
   294 F.3d 82 (D.C. Cir. 2002) ......................................................... 18

*Price v. Socialist People's Libyan Arab Jamahiriya*,
   389 F.3d 192 (D.C. Cir. 2004) ....................................................... 45

*Princz v. Federal Republic of Germany*,
   26 F.3d 1166 (D.C. Cir. 1994) ....................................................... 38

## TABLE OF AUTHORITIES—Continued

Page

*Rendall-Speranza v. Nassim*,
　107 F.3d 913 (D.C. Cir. 1997) ............................................................... 44

*Republic of Argentina v. Weltover, Inc.*,
　504 U.S. 607 (1992) ................................................................ 19, 20, 38

*Rosenkrantz v. Inter-Am. Dev. Bank*,
　35 F.4th 854 (D.C. Cir. 2022) ............................................................. 32

*Saudi Arabia v. Nelson*,
　507 U.S. 349 (1993) ............................................................................. 33

*Security Pac. Nat'l Bank v. Derderian*,
　872 F.2d 281 (9th Cir. 1989) .............................................................. 26

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*,
　549 U.S. 422 (2007) ............................................................................. 45

*Swint v. Chambers Cnty. Comm'n*,
　514 U.S. 35 (1995) ................................................................................. 2

*Terenkian v. Republic of Iraq*,
　694 F.3d 1122 (9th Cir. 2012) ...................................................... 41, 42

*U.S. Fid. & Guar. Co. v. Braspetro Oil Servs., Co.*,
　199 F.3d 94 (2d Cir. 1999) .................................................................. 25

*Valambhia v. United Republic of Tanzania*,
　964 F.3d 1135 (D.C. Cir. 2020) .......................................................... 38

*Wye Oak Tech., Inc. v. Republic of Iraq*,
　No. 1:10-CV-1182-RCL, 2022 WL 17820569 (D.D.C. Dec. 20, 2022) ............. 37

**STATUTES:**

28 U.S.C. § 1291 .................................................................................... 2

## TABLE OF AUTHORITIES—Continued

Page

28 U.S.C. § 1330(a) ........................................................................ 1

28 U.S.C. § 1605(a)(2) ............................................................. 3, 20, 32

**RULES:**

Fed. R. Evid. 801(d)(2) ................................................................ 24

Fed. R. Evid. 803(3) ..................................................................... 25

**OTHER AUTHORITY:**

Export-Import Bank of the U. S., *Export Finance Solutions for U.S. Businesses*, *available at* https://tinyurl.com/mpamn2dk ................................................... 9, 29

# GLOSSARY

| | |
|---|---|
| EIG: | EIG Energy Fund XIV, L.P.; EIG Energy Fund XIV-A, L.P.; EIG Energy Fund XIV-B, L.P.; EIG Energy Fund XIV (Cayman), L.P.; EIG Energy Fund XV, L.P.; EIG Energy Fund XV-A, L.P.; EIG Energy Fund XV-B, L.P.; and EIG Energy Fund XV (Cayman), L.P. |
| FSIA: | Foreign Sovereign Immunities Act |
| Petrobras: | Petróleo Brasileiro S.A. |
| Santander | Banco Santander Brasil S.A. |
| Sete: | Sete Brasil Participações, S.A. |

IN THE

# United States Court of Appeals
# for the District of Columbia Circuit

───────────

EIG ENERGY FUND XIV, L.P., *et al.*,

Plaintiffs-Appellees,

v.

PETRÓLEO BRASILEIRO S.A.,

Defendant-Appellant,

ODEBRECHT, S.A., *et al.*,

Defendants.

───────────

On Appeal from the United States District Court
for the District of Columbia
No. 1:16-cv-00333-APM
District Judge Amit P. Mehta

───────────

**FINAL BRIEF FOR APPELLANT PETRÓLEO BRASILEIRO S.A.**

───────────

**JURISDICTIONAL STATEMENT**

Plaintiffs-Appellees EIG Energy Fund XIV, L.P., and associated entities (collectively EIG) invoked the District Court's jurisdiction under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1330(a).

The District Court denied Defendant-Appellant Petróleo Brasileiro S.A. (Petrobras)'s motion for summary judgment on sovereign-immunity grounds on August 8, 2022.  JA97-177 [Order].  Petrobras timely appealed on August 19,

1

2022.  JA178 [Notice of Appeal].  This Court has jurisdiction over the portion of the District Court's order denying Petrobras's motion for summary judgment on sovereign-immunity grounds under 28 U.S.C. § 1291 and the collateral-order doctrine.  *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1025 (D.C. Cir. 1997).  The Court also has pendent jurisdiction over the portion of the District Court's order granting in part EIG's motion for summary judgment because it is inextricably intertwined with the court's sovereign-immunity ruling. *Infra* pp. 44-45; *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 50-51 (1995).

## INTRODUCTION

Petrobras, an energy company majority-owned and controlled by the Brazilian government, is being haled into U.S. court by EIG, a collection of mostly foreign entities, after EIG's investment in a non-party Brazilian company failed. But the Foreign Sovereign Immunities Act (FSIA) rightly bars a U.S. suit, like this one, brought against a foreign sovereign based on foreign conduct that has only indirect U.S. effects.  To overcome Petrobras's presumptive immunity from suit, EIG must establish that Petrobras's allegedly fraudulent misrepresentations to EIG caused a direct effect in the United States, such as by showing that Petrobras specifically targeted EIG for investment.

EIG hurdled that barrier at the motion-to-dismiss stage by relying on its own self-serving allegations that Petrobras specifically targeted EIG.  *EIG Energy Fund*

2

*XIV, L.P. v. Petroleo Brasileiro, S.A.*, 894 F.3d 339, 342 n.1, 348 (D.C. Cir. 2018) (*EIG II*).  But at summary judgment, *EIG II* does not control because EIG had to come up with *facts*, not just allegations.  It never did.  The evidence found to be undisputed by the District Court shows that EIG approached Petrobras—in Brazil—about an investment in a risky oil-drillship project off the Brazilian coast, and, as EIG admits, Petrobras neither desired nor accepted EIG's foreign investment.  It was a third-party Brazilian company—Sete Brasil Participações, S.A. (Sete)—that financed and managed the drilling project.  Sete closed a first round of financing, in which exclusively non-U.S. investors were allowed to participate.  But EIG wanted in, and so it courted Sete—a separately financed, managed, and operating company—for months, and it was Sete that later allowed EIG to invest as part of a second round of financing.  Eventually, the project, and EIG's investment, collapsed after misconduct by certain individuals was publicly revealed by Brazilian authorities.

So EIG sued Petrobras for fraud in the United States, arguing that Petrobras failed to disclose to EIG the corruption perpetrated by certain individuals at Petrobras and then at Sete.  To establish U.S. jurisdiction, EIG invoked the direct-effects clause of the FSIA's commercial-activity exception, which requires that EIG show both that its claims are "based upon" Petrobras's conduct and that the *same* conduct had a "direct effect" in the United States.  28 U.S.C. § 1605(a)(2).

3

Unable to substantiate its allegations that Petrobras targeted EIG, EIG has pivoted, arguing that Petrobras targeted *other* U.S. investors.  The facts found to be undisputed by the District Court give lie to that argument; those other potential U.S. investors targeted Petrobras, just as EIG did.  And in all events, any targeting of other U.S. investors is irrelevant because EIG's claims are not based upon Petrobras's supposed targeting of non-EIG U.S. investors.  Without the statutorily required nexus—which was not at issue in *EIG II*—Petrobras is immune and EIG's suit should be dismissed.

There is more.  Discovery also revealed a series of intervening events between EIG's initial pursuit of Petrobras and EIG's eventual investment in Sete. As it turned out, Sete opened up for U.S. investment only after it had assumed responsibility for its own fundraising and had engaged in months of further communications with EIG.  And the superseding act of Sete independently communicating with EIG and deciding to open itself for U.S. investment means that any effects EIG may have felt in the United States were not a direct consequence of Petrobras's initial responses to EIG's inquiries about a potential investment opportunity.

Worse yet, the District Court went on to decide the merits of EIG's claims, granting EIG summary judgment, even though the court's immunity decision is not

conclusive.  In other words, the court assumed its jurisdiction so that it could rule on the merits, a fundamental federal-courts mistake.

The flaws in the District Court's analysis matter to more than just Petrobras. If the facts related by the District Court amount to a direct effect in the United States, then the FSIA's direct-effects clause would allow U.S. jurisdiction any time a foreign sovereign responds to an aggressive American investor.  The FSIA—and sovereigns' immunity to suit in our Nation's courts—is not so porous.

This Court should reverse and direct judgment for Petrobras.  At the very least, the Court should reverse the grant of summary judgment for EIG on liability while the District Court's jurisdiction remains to be decided at trial.

## ISSUES PRESENTED FOR REVIEW

1.    Whether the District Court erred in concluding that EIG's claims are "based upon" Petrobras's "specific targeting" of EIG or other U.S. investors where Petrobras merely responded to EIG's entreaties with responsive information about the drillship project, and where EIG's claims have nothing to do with anything Petrobras did or said to other U.S. investors.

2.    Whether the District Court erred in determining the effects EIG felt in the United States were sufficiently "direct" for purposes of the FSIA where the effects were not an immediate consequence of Petrobras's conduct but instead were attenuated by numerous superseding and independent events.

5

3.     Whether the District Court prematurely granted EIG summary judgment on its fraud claims because its decision as to Petrobras's sovereign immunity is not a conclusive determination.

4.     Whether this Court has jurisdiction over Petrobras's interlocutory appeal where the District Court denied Petrobras summary judgment on its sovereign-immunity defense and Petrobras on this appeal does not challenge the District Court's factual determinations.

## PERTINENT STATUTES

Pertinent statutes are reprinted in the addendum.

## STATEMENT OF THE CASE

**The Pre-Salt Reserves and Sete.**  Petrobras is a diversified energy company majority-owned by the Brazilian government.  JA100 [Op. 4].[1]  Petrobras discovered oil reserves off the Brazilian coast in early 2007, known as the "Pre-Salt Reserves."  JA103 [Op. 7].  Petrobras planned to charter ultra-deep-water drillships and platforms to exploit the Pre-Salt Reserves, but under Brazilian law, those drillships had to be built in Brazil.  *Id.*  Brazil did not yet have enough of

---

[1] For purposes of this appeal only, Petrobras takes as true the facts the District Court found to be undisputed.  *See Barham v. Salazar*, 556 F.3d 844, 847 (D.C. Cir. 2009) (this Court may not resolve a "fact-related dispute about the pre-trial record" on an interlocutory appeal of a summary-judgment order denying immunity) (emphasis and citation omitted).

these specialized, and expensive, drillships and platforms to complete the project. *Id.* So Petrobras's board authorized the construction of 28 specialized ultra-deep-water drilling rigs, at a total cost of about $22 billion in capital, and it created a working group that would propose the actions necessary to carry out the massive project. JA103-104 [Op. 7-8]. Petrobras hired Banco Santander Brasil S.A. (Santander) as its financial advisor to help structure and secure financing for the construction. JA104 [Op. 8]. Petrobras also ran the contract-bidding process for the first seven drillships. JA104-105 [Op. 8-9].

Petrobras and Santander determined it was important to finance the construction in a way that did not depend on Petrobras's cash or draw on Petrobras's credit, so in 2010 Petrobras approved the creation of a separate entity—Sete—to raise money and to contract with shipyards for the necessary construction. *Id.* Petrobras held 10% of Sete's shares, and FIP Sondas, a Brazilian investment vehicle for equity investors in Sete (including, eventually, EIG), held the remaining 90%. *Id.*

At this point, Petrobras began to hand off responsibility for the nascent project to Sete. Petrobras transferred the bidding process for the first seven drillships to Sete, and Santander began to advise Sete on the project finances until Lakeshore Financial Partners Participações assumed the role of Sete's financial advisor. JA104-106 [Op. 8-10]. In December 2010, Petrobras temporarily

7

appointed João Carlos de Medeiros Ferraz, who had been General Manager of Special Projects Financing in Petrobras's Finance division, as Sete's CEO, and Pedro Jose Barusco Filho, who had been Executive Manager of Engineering in Petrobras's Services division, as Sete's chief operating officer. JA100-102, 105 [Op. 4-6, 9]. A few months later, in May 2011, Barusco and Ferraz would formally transition out of Petrobras and fully into their roles at Sete, after Sete's Brazilian shareholders—90% of whom were not Petrobras but sophisticated Brazilian investors[2]—approved the officers' appointments. JA105 [Op. 9]. Renato Duque, the head of Petrobras's Services division, remained at Petrobras and involved with Sete. JA100, 105 [Op. 4, 9].

After assuming responsibility for its own fundraising, Sete raised an initial round of financing from a group of exclusively Brazilian investors. JA105 [Op. 9]. Sete then inked contracts for the construction of the first seven rigs that Petrobras had awarded and assigned to Sete. *Id.*

It was later revealed that, during this period, certain individuals, including Barusco and Duque, were engaged in misconduct, funneling bribes from Petrobras

---

[2] The investors included some of the largest and most-sophisticated financial entities in Brazil, including, for example, Previ and Petros, Brazil's two largest pension funds, and BTG Pactual, Latin America's largest investment bank. JA679-680 [Ex. 80, Investment Agreement].

contractors to themselves and others.  JA100 [Op. 4].  After Barusco transitioned to Sete, the misconduct occurred there as well.  JA105 [Op. 9].

**EIG Invests in Sete.**  EIG is a group of related investment funds based in the United States and Cayman Islands.  JA98 [Op. 2].  In 2010, EIG was looking for opportunities to invest in Brazil, led by its senior investment professional Kevin Corrigan.  JA106 [Op. 10].  EIG first learned of Sete's drillship project when a former colleague of Corrigan's, who then worked at French investment bank Société Générale, sent Corrigan an email including a presentation about the project.  *Id.*  Société Générale was not working for Petrobras or Sete.

Petrobras, for its part, had accepted invitations to present the Sete investment opportunity at two conferences in Brazil, which mostly Brazilian investors and some U.S. investors—but not EIG—attended.  JA114-117 [Op. 18-21]. Petrobras's advisors had internally brainstormed lists of potential investors that included U.S. companies, JA115 [Op. 19], but that brainstorming never turned into sales pitches or even outreach.  And Ferraz went on a "road show" where he spoke to potential suppliers and export-credit agencies like the U.S. Export-Import Bank. JA114 [Op. 18].  These entities were not speaking to Ferraz about investing in Sete; they were interested in the goods and services the project might require, because export-credit agencies could offer loans and guarantees that would permit suppliers to bid with confidence for the business of non-U.S. buyers.  *See* Export-

9

Import Bank of the United States, *Export Finance Solutions for U.S. Businesses* 3,

5, *available at* https://tinyurl.com/mpamn2dk (describing export-credit insurance

and loan-guarantee services that the Export-Import Bank offers to facilitate U.S.

exports).

After hearing about the Sete project from Société Générale, EIG contacted

Petrobras seeking information on the project, as did other U.S. companies looking

to invest in Brazil.  JA116-117 [Op. 20-21].  Corrigan admitted that initial

interactions with Petrobras involved him attempting to convince the company to

allow non-Brazilian investment; in fact, it was his understanding in late 2010 that

Petrobras had no "desire to have international investors in Sete."  JA120-121 [Op.

24-25].

Petrobras nonetheless responded to EIG's outreach and allowed EIG to

conduct due diligence on Sete.  JA106 [Op. 10].  In late December 2010, shortly

before formally handing off financing responsibilities to Sete, Petrobras authorized

Santander to give EIG access to a data room with Sete-related information

conditioned on EIG disclaiming reliance on the data-room materials.  JA119-120

[Op. 23-24].  But Petrobras never accepted an investment from EIG.  And Sete

ultimately closed its first round of financing and contracted for its first drilling rigs

without having taken any money from U.S. investors.  JA124 [Op. 28].

Only after Sete had assumed responsibility for its own fundraising and had engaged in months of further communications with EIG did Sete open up to foreign investment, including EIG's. *Id.* In the intervening period, EIG continued to receive information and conduct diligence on the investment. Ferraz, already having been temporarily appointed as Sete CEO, hosted Corrigan for a meeting in Brazil in March 2011, and more EIG representatives met with Ferraz, by then the confirmed Sete CEO, in Brazil in August. JA119-120 [Op. 23-24].

EIG officially decided to invest in Sete and entered the first of a series of investment agreements on June 30, 2011. JA107 [Op. 11]. EIG transmitted its first funds on August 3, 2012. From then until January 2015, when it made its last investment, EIG invested over $221 million in Sete. *Id.* Its money was funneled from EIG to Luxembourgian entities, which then invested in FIP Sondas, with FIP Sondas at that time holding 95% of Sete's shares. *Id.*

**Sete's Insolvency.** In early February 2015, Barusco's testimony and plea agreement with Brazilian authorities in connection with Operation Lava Jato—a criminal investigation to uncover political and corporate corruption in Brazil— became public and implicated Sete in the ongoing misconduct. JA109 [Op. 13]. That posed a problem for Sete. Sete's lenders required anticorruption declarations from Petrobras and the shipyards as a condition of any loans to Sete, but the Barusco revelations meant Sete and Petrobras could not deliver those declarations,

11

and Sete's efforts to secure bank financing effectively ended.  JA108-109 [Op. 12-13].  Sete later unraveled, falling to a book value of zero, and EIG lost its investment.  JA109 [Op. 13].

**EIG's Suit.**  EIG sued Petrobras in the United States, asserting jurisdiction under the FSIA.  EIG alleged that Petrobras had fraudulently induced it to invest in Sete and that Petrobras had aided and abetted Sete in making false and misleading statements inducing EIG to invest in Sete.  JA109-110 [Op. 13-14].  Petrobras moved to dismiss for lack of subject-matter jurisdiction, asserting its presumptive FSIA immunity.  JA110 [Op. 14].

The District Court denied the motion, concluding that it had jurisdiction under the direct-effects prong of FSIA's commercial-activities exception.  *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro S.A.*, 246 F. Supp. 3d 52 (D.D.C. 2017) (*EIG I*).  This Court affirmed in a divided opinion.  It held that EIG had "made out a *prima facie* case for jurisdiction by alleging that Petrobras specifically targeted U.S. investors for Sete; that Petrobras intentionally concealed the ongoing fraud at Petrobras and at Sete; and that the money invested in Sete was used to pay bribes and kickbacks."  *EIG II*, 894 F.3d at 345 (citations omitted).  Petrobras explained that Sete's lenders choosing not to lend was an intervening act that broke the chain of causation, and that any harm felt by EIG was not a direct effect felt in the United States.  *Id.* at 346-349.  The Court disagreed, holding that

12

"[a]ccepting . . . as true" EIG's allegations that Petrobras and Sete had

" 'specifically targeted' U.S. investors," EIG had shown a direct effect in the

United States. *Id.* at 348.

The case proceeded through discovery, and the parties cross-moved for

summary judgment, with Petrobras renewing its sovereign-immunity argument.

JA110 [Op. 14].  Petrobras explained that it did not specifically target EIG or other

U.S. investors; that EIG pursued Petrobras, rather than the other way around, was

relevant to whether Petrobras targeted EIG; that Petrobras's presentations at

conferences in Brazil to predominantly non-U.S. investors and some U.S. investors

did not constitute targeting of U.S. investors; and that EIG had conceded its

impression was that Petrobras was not interested in U.S. investment for Sete and

had to be talked into it.  JA117-121 [Op. 21-25].  Petrobras further argued that any

interactions aimed at non-EIG investors were irrelevant because EIG's claims were

not "based upon" those interactions and that a litany of milestones between the

time Sete assumed responsibility for its own financing and contracting in March

2011 and Sete's ultimate unraveling in June 2016 were superseding events such

that EIG's injury was not an immediate consequence of Petrobras's commercial

activity.  JA118, 124-125 [Op. 22, 28-29].

The District Court denied Petrobras's motion, determining that it had

jurisdiction over Petrobras under the direct-effects clause of the commercial-

13

activity FSIA exception. JA110-126 [Op. 14-30]. The court held that EIG satisfied its *prima facie* case as to jurisdiction because EIG "cite[d] ample evidence showing that Petrobras 'specifically targeted U.S. investors for Sete,' " including records showing that Petrobras "contemplated" U.S. investment. JA113, 117 n.7 [Op. 17, 21 n.7]. And it held that Petrobras's arguments were "not enough to defeat EIG's prima facie case." JA121, 122 [Op. 25, 26]. As for Petrobras's argument that intervening events meant any effects in the United States were not sufficiently "direct," the court viewed it as a "reprise" of the arguments Petrobras made at the motion-to-dismiss stage. JA124-126 [Op. 28-30].

The District Court then proceeded to the merits. The court granted EIG summary judgment against Petrobras on the merits of EIG's fraud and aiding-and-abetting claims. The court held that Petrobras made statements about the drillship project that failed to disclose the misconduct certain individuals were engaged in with both knowledge of the statements' falsity and an intent to deceive and that EIG relied on those statements in choosing to invest in Sete. JA126-170 [Op. 30-74]. But the District Court denied summary judgment on damages, concluding that there were material issues of fact to resolve regarding the value of EIG's investment and the amount of its loss, and as to whether EIG was obligated to mitigate its damages. JA170-177 [Op. 74-81].

14

This interlocutory appeal followed.  JA178 [ECF No. 199].  The District Court stayed proceedings pending appeal, rejecting EIG's argument that the appeal was frivolous and that this Court lacked jurisdiction over it.  JA179-180 [ECF No. 206].  EIG simultaneously sought summary affirmance or dismissal in this Court. The Court denied the motion to summarily affirm and referred the motion to dismiss to the merits panel.

## SUMMARY OF ARGUMENT

I.  Petrobras is entitled to summary judgment because its conduct did not cause a direct effect in the United States for two reasons.

*First*, EIG fails the first prong of the *EIG II* test, which requires that Petrobras have specifically targeted EIG or other U.S. investors.  Petrobras did not target EIG; EIG targeted Petrobras and Petrobras responded to that outreach. Petrobras never targeted EIG or the United States with communications, advertisements, or visits.  In fact, EIG first became aware of Petrobras from a third party, which caused EIG to reach out to Petrobras.  Although Petrobras "did not discourage EIG's interest" in Sete, JA119 [Op. 23], it did not have to.  Mere contemplation of EIG's desire to invest in Sete is not enough.  And Sete, not Petrobras, ultimately accepted EIG's investment.  Just as in the personal-jurisdiction context, where it is not purposeful availment when a defendant meets its customers where they are located or is aware that they reside in the forum, it

15

does not constitute targeting under the FSIA for Petrobras to have responded to EIG's inquiries with information about the drillship project.

Petrobras similarly did not target other U.S. investors; those investors targeted Petrobras. The District Court recognized that, around the time Petrobras had (according to the District Court) "contemplated" U.S. investment in various ways, even EIG believed that Petrobras actually had no intention to seek out international investors in Sete. Petrobras's mere contemplation of potential U.S. investment in Sete—just like Petrobras's supposed contemplation of EIG's desire to invest in Sete—is not enough to amount to targeting.

*Second*, it is irrelevant whether Petrobras targeted U.S. investors other than EIG because EIG's claims are not based upon anything Petrobras said or did with respect to those other investors as the FSIA requires. Rather, the gravamen of EIG's suit is the alleged misrepresentations that Petrobras made to EIG. The District Court, however, impliedly relied on Petrobras's supposed targeting of other U.S. investors for the jurisdictional nexus. That was wrong. EIG's claims are not based on anything Petrobras did or said to any other potential U.S. investor. And there is no evidence that Petrobras made the same alleged misrepresentations to other potential U.S. investors as to EIG.

The District Court failed to engage with this analysis, reasoning that its reliance on "Petrobras's interactions with investors other than EIG supports

16

another element of the jurisdictional inquiry" from *EIG II*: whether Petrobras *targeted* those other investors.  JA118 [Op. 22].  But *EIG II* did not consider the based-upon requirement because it was not at issue on the facts asserted in EIG's complaint; EIG alleged that it had been targeted and its claims were based on that targeting.  894 F.3d at 345.  *EIG II* therefore does not address the separate "based upon" issue raised by EIG's theory shift.  The District Court was wrong to breach Petrobras's immunity as a result of conduct involving non-parties that was not the gravamen of EIG's claims.

II.  Even if Petrobras did target EIG or other U.S. investors, any effect EIG may have felt in the United States was insufficiently direct because it was separated from Petrobras's conduct by a series of independent superseding events.  A direct effect under the FSIA, must follow as an immediate consequence of Petrobras's conduct.  But the District Court did not analyze the superseding events, and associated record evidence revealed during discovery, because it dismissed Petrobras's argument as a re-run of its motion-to-dismiss argument.

III.  The Court should exercise pendent jurisdiction over and vacate the District Court's premature grant of summary judgment for EIG on its fraud and aiding-and-abetting claims because the disposition of the immunity issue and the merits of EIG's claims are inextricably intertwined.  Courts may not rule on the merits of any issue without first determining that it has jurisdiction over the claim,

and here the court's denial of sovereign immunity was not conclusive. Rather, the court's determination was based on the then-existing record and was only that Petrobras had not shown an entitlement to summary judgment in its favor. The claims against Petrobras should not be conclusively decided until jurisdiction has been conclusively decided.

IV. This Court has jurisdiction over Petrobras's appeal because Petrobras does not challenge the District Court's factual determinations in this Court at this time. Petrobras instead takes as true, for purposes of this appeal only, the facts the District Court found to be undisputed. Petrobras then argues that all of the conduct found by the District Court still does not amount to a valid claim—it neither constitutes targeting nor a sufficiently direct effect in the United States. Applying the law to the facts found by the District Court, no FSIA exception applies to EIG's suit. That is a perfectly proper interlocutory appeal.

This Court should reverse.

## STANDARD OF REVIEW

This Court reviews a district court's finding that it possesses subject-matter jurisdiction under the FSIA de novo. *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 91 (D.C. Cir. 2002). In the summary-judgment context, the Court will draw all reasonable inferences in favor of the nonmoving party and ask whether there remains a disputed issue of fact requiring resolution at trial.

*Hansen v. PT Bank Negara Indonesia (Persero)*, 706 F.3d 1244, 1247 (10th Cir. 2013).  And because this is an interlocutory appeal, the Court asks only whether, on the undisputed facts found by the District Court, Petrobras is entitled to judgment on its sovereign-immunity defense.  *See Behrens v. Pelletier*, 516 U.S. 299, 313 (1996).

## ARGUMENT

The Foreign Sovereign Immunities Act (FSIA) "provides the sole basis for obtaining jurisdiction over a foreign state" in the United States.  *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 30 (2015).  A foreign state is presumptively immune from United States jurisdiction unless one of the FSIA's exceptions applies, *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 611 (1992), and all agree that Petrobras is an instrumentality of the Brazilian government presumptively immune to suit, *EIG II*, 894 F.3d at 342-343.  This case concerns the third clause of the "commercial activity" exception, which provides that a foreign state is not immune from any suit that is "based . . . upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."  28 U.S.C. § 1605(a)(2).

Under this direct-effects clause, EIG must show that its suit is "(1) 'based . . . upon an act outside the territory of the United States'; (2) that was

19

taken 'in connection with a commercial activity' of [a foreign government] outside this country; and (3) that 'cause[d] a direct effect in the United States.' " *Weltover*, 504 U.S. at 611 (citation omitted); *see Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013). In other words, EIG must produce evidence showing that its claims are "based upon" an act that caused an "immediate consequence" and thus had a direct effect in the United States. *Weltover*, 504 U.S. at 611, 618 (citation omitted).

Put to practice, this Court held in *EIG II* that EIG must show that (1) "Petrobras specifically targeted U.S. investors for Sete"; (2) "Petrobras intentionally concealed the ongoing fraud at Petrobras and at Sete"; and (3) "money invested in Sete was used to pay bribes and kickbacks." *EIG II*, 894 F.3d at 345. EIG never did. But the District Court determined that EIG satisfied its prima facie burden on jurisdiction, and it granted EIG summary judgment on the merits of its claims. This Court should correct the District Court's errors and preserve Petrobras's sovereign immunity. At the very least, it should reverse the District Court's grant of summary judgment to EIG on liability while the District Court's jurisdiction remains unsettled.

I.    **THE DISTRICT COURT SHOULD HAVE GRANTED PETROBRAS SUMMARY JUDGMENT BECAUSE EIG, AND OTHER POTENTIAL U.S. INVESTORS, TARGETED PETROBRAS SEEKING TO INVEST IN SETE, NOT THE OTHER WAY AROUND.**

A.    **Petrobras's actions in responding to EIG and other investors' inquiries about investing in Sete do not constitute "targeting" under *EIG II*.**

EIG's attempt to establish jurisdiction over Petrobras in the United States fails on *EIG II*'s first prong.  Petrobras did not target EIG; EIG targeted Petrobras. EIG first became aware of the Pre-Salt Reserves drillship project through a third party, and EIG then "initiated each of the[] interactions" with Petrobras.  JA106, 119 [Op. 10, 23].  Although the District Court observed that Corrigan, EIG's senior investment professional, understood that Petrobras was not seeking, or even open to, foreign investment, JA120-121 [Op. 24-25], the court thought it notable that "Petrobras did not discourage EIG's interest in investing," JA119 [Op. 23].

That cannot be the standard for abrogating an instrumentality's sovereign immunity; if it is, then this Court's "targeting" criterion would be met in *every* FSIA case where a foreign-state defendant answers inquiries about potential U.S. investment.  Thankfully, merely responding to a U.S. investor's inquiries, without ever actually accepting U.S. investment does not, standing alone, subject a foreign sovereign to U.S. jurisdiction; FSIA and analogous personal-jurisdiction precedent demonstrates that something more is required for a sovereign to have targeted.

1.  It is not enough that Petrobras contemplated EIG's investment, JA118-119 [Op. 22-23] (citation omitted), because Petrobras's awareness that EIG was interested in investing in Sete cannot be targeting by Petrobras.  The District Court characterized this argument as Petrobras proposing a "restrictive understanding of 'contemplat[ing]' or 'specifically target[ing]' U.S. investors."  JA119 [Op. 23] (citation omitted).  But this principle comes right from the Second Circuit's decision in *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 110 (2d Cir. 2016), which *EIG II* quoted for its targeting criterion and on which the District Court purported to rely.  JA118 [Op. 22].

*Atlantica* demonstrates that the Second Circuit did not use the word "contemplate" as broadly as did the District Court.  Rather, *Atlantica* characterized the foreign-state defendant as having "contemplated investment by United States persons" where the defendant "marketed" the securities in the United States and "directed that marketing to U.S. investors."  813 F.3d at 110-112, 115 (citations omitted).  For example, the defendant "made a number of public statements" to American press outlets in an effort to "prop up" the value of the securities and assure U.S. investors.  *Id.* at 104.  And the defendant even "sent representatives to the United States" to meet with investors to relay some of the misrepresentations at issue.  *Id.*

22

Petrobras did not contemplate U.S. investment the same way the defendant did in *Atlantica*, and the District Court's contrary reading—that a defendant contemplates foreign investment whenever it responds to investment interest from U.S. sources—risks greatly broadening the scope of the direct-effects clause. The *Atlantica* defendant affirmatively "acted to encourage" U.S. investment. *Id.* at 104, 111. But according to the District Court, Petrobras merely "did not *dis*courage" EIG's interest in Sete. JA119 [Op. 23] (emphasis added). The record here is nothing like *Atlantica*. Petrobras did not engage in U.S.-targeted marketing or U.S. visits to market a Sete investment to EIG. JA119-120, 127-141 [Op. 23-24, 31-45]. Without more, EIG cannot rely on Petrobras being aware of potential U.S. investment to bring this case within *EIG II*'s adoption of *Atlantica*'s targeting standard.

The District Court below quibbled with Petrobras's argument that "EIG concedes that Sete was not intended to have U.S. investors." JA121 [Op. 25]. The District Court determined that Corrigan's testimony was inadmissible hearsay if offered to prove that Petrobras did not specifically target U.S. investors, because although Corrigan's testimony was admissible as a statement by a party-opponent, to the extent it purported to convey what Petrobras told Santander, it was second-level hearsay without an exception. *Id.*

That was incorrect.  It is true that one part of Corrigan's testimony relayed what he understood based in part on statements Santander made to him.  JA753-754 [Ex. 10 at 82:15-83:3] (Corrigan understood there was not a "desire to have international investors in Sete").  But the court conceded that this statement was still admissible as evidence of Corrigan's understanding at the time.  JA121 [Op. 25].  Corrigan's testimony is therefore evidence that, in late 2010, EIG had not been targeted by Petrobras; if it had, EIG's corporate representative Corrigan would not have testified that EIG's understanding was Petrobras had no desire for international investors at that time.

Other portions of Corrigan's testimony that the District Court cited, moreover, were made *without* the qualification that Corrigan was merely repeating what Santander told him.  JA120-121 [Op. 24-25]; JA746-747; 757-758 [Ex. 10 at 72:11-73:10; 87:10-88:17] (Corrigan testifying that the "original thesis of this transaction did not foresee outside investors" and that "as of March 2011 . . . Petrobras had not yet made any solicitation to EIG to become an investor in Sete").  The District Court incorrectly lumped these statements together with the statements made by someone at Santander.  Nowhere did Corrigan limit these statements to what he had heard from Santander.  *See, e.g.*, JA746-747 [Ex. 10 at 72:11-73:10].  These statements therefore should have been admissible, as statements by Corrigan, a party-opponent, Fed. R. Evid. 801(d)(2), or as statements

24

of a present state of mind, Fed. R. Evid. 803(3), to show that Sete was not intended to have U.S. investors and that Petrobras had not targeted EIG specifically or U.S. investors generally.

2. To the extent the targeting standard from *Atlantica* that this Court adopted in *EIG II* is unclear, the analogous purposeful-availment case law from personal-jurisdiction precedent confirms that jurisdiction is inappropriate here. In the personal-jurisdiction context, there is no purposeful availment when a defendant meets its customers where they are located or is aware that they reside in the forum. It therefore did not constitute targeting when Petrobras responded to EIG's entreaties with responsive information about the drillship project.

The direct-effects inquiry is analogous to the personal-jurisdiction inquiry; although distinct, courts have considered the two to be related and overlapping. *See, e.g.*, *Guevara v. Republic of Peru*, 608 F.3d 1297, 1309-10 (11th Cir. 2010) (analyzing the "direct effect" element and analogizing to, but not incorporating, the "minimum contacts" test); *see also Abi Jaoudi & Azar Trading Corp. v. Cigna Worldwide Ins. Co.*, 391 F. App'x 173, 181 (3d Cir. 2010) (acknowledging that the district court's ruling on personal jurisdiction may be "inextricably intertwined" with the district court's ruling on sovereign immunity) (citation omitted); *U.S. Fid. & Guar. Co. v. Braspetro Oil Servs., Co.*, 199 F.3d 94, 97 (2d Cir. 1999) (per curiam) (similar). The Ninth Circuit has even expressly incorporated the

minimum-contacts test wholesale into the FSIA's direct-effects analysis. *See Security Pac. Nat'l Bank v. Derderian*, 872 F.2d 281, 286-287 (9th Cir. 1989).

For good reason: The purposeful-availment requirement serves a similar purpose as the direct-effects requirement, "ensur[ing] that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *LAK, Inc. v. Deer Creek Enters.*, 885 F.2d 1293, 1300 (6th Cir. 1989) (citation omitted). When a plaintiff places a business call to a defendant, the defendant is not "required to hang up the phone" if he wishes to avoid purposefully availing himself of "whatever state or states the call[] happened to come from." *Id.* at 1301. Similarly, when a defendant communicates with a plaintiff in a State because that is where the plaintiff is located, and not because the defendant sought to "exploit any market for its products" there, the communications do not constitute purposeful availment. *International Techs. Consultants, Inc. v. Euroglas S.A.*, 107 F.3d 386, 395 (6th Cir. 1997); *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 723 (6th Cir. 2000). After all, the defendant "presumably would have been pleased to communicate with [plaintiff] wherever the latter wished." *Euroglas*, 107 F.3d at 395.

A defendant being aware of a counterparty's location and engaging with it while it is in the forum, moreover, does not mean the defendant targeted the forum, especially when "[d]efendant did not initiate the contact with plaintiff." *Phillips v.*

*Prairie Eye Ctr.*, 530 F.3d 22, 29 (1st Cir. 2008); *id.* ("There is little besides awareness here.  It stretches too far to say that Prairie Eye, by mailing a contract with full terms to Massachusetts for signature and following up with three e-mails concerning the logistics of signing the contract, should have known that it was rendering itself liable to suit in Massachusetts.").  Courts hold that there is no purposeful availment even when a defendant physically visits plaintiff in a different forum if the travel came about only because that is where the plaintiff "chose to be headquartered . . . , not because [the defendant] sought to further its business and create 'continuous and substantial' consequences there."  *Calphalon*, 228 F.3d at 723.  It would take more, like the defendant having a marketing strategy tailored to that forum or providing regular advice to customers in the forum.  *See LNS Enters. LLC v. Continental Motors, Inc.*, 22 F.4th 852, 861 (9th Cir. 2022).

Petrobras never did the more.  EIG initiated the first contact with Petrobras, and each subsequent interaction thereafter.  JA106, 119 [Op. 10, 23].  Corrigan admitted his understanding in late 2010 was that Petrobras did not want U.S. investors and that his goal was to persuade Petrobras otherwise.  JA121-122 [Op. 25-26].  Petrobras did respond to EIG's outreach, sharing presentations about the drillship project and giving EIG access to the data room in late 2010.  JA119-120 [Op. 23-24].  But Sete took over responsibility for the financial aspects in early

2011 and began its own discussions with EIG and ultimately it was Sete that allowed EIG to invest mid-2011. JA120 [Op. 24].

The District Court believed that even though EIG "first initiated communications about Sete," Petrobras still targeted EIG for FSIA purposes by engaging "in a sustained course of dealing over many months that conveyed its desire to obtain an investment from EIG." *Id.* But the question under *EIG II* isn't whether Petrobras "dealt with" EIG. The question is whether Petrobras *targeted* its marketing efforts specifically at EIG. Petrobras did not; Petrobras instead responded to EIG's inquiries about a deal that EIG initiated and then ultimately pursued to completion with Sete, not Petrobras.

3. Petrobras also did not target other U.S. investors; any other potential U.S. investors targeted Petrobras. Just as with any supposed contemplation of EIG investment, it is not enough to suggest that Petrobras contemplated U.S. investors more generally. *See supra* pp. 21-23. Something more is needed, and EIG never came forward with evidence of it.

The District Court held that Petrobras targeted U.S. investors because it accepted an invitation to present about the Sete project at two conferences in Brazil where mostly Brazilian investors and some U.S. and other non-Brazilian investors were in attendance; its financial advisor had internally brainstormed a list of potential investors that included U.S. companies; and Ferraz went on a road show

where he spoke to potential suppliers and export credit agencies like the U.S. Export-Import Bank.  JA114-117 [Op. 18-21].  All true.  But the District Court drew the wrong conclusion.  Even Corrigan, who himself was courting Petrobras about Sete, understood that Petrobras in late 2010—right before the company gave up control over the drillship project to Sete but after it had presented at the two conferences—still had no intention of accepting international investors.  JA120 [Op. 24].  What's more, each set of evidence the District Court relied on to show Petrobras's alleged targeting of other U.S. investors, upon closer inspection, amounts to nothing more than responding to these investors' entreaties.

The first set of evidence includes a "road show" Ferraz attended to speak to potential suppliers and export-credit agencies, like the U.S. Export-Import Bank. JA114 [Op. 18].  But export-credit agencies don't invest in Sete.  They offer loans and guarantees that, in turn, allow suppliers to bid with confidence for the business of non-U.S. buyers.  *See* Export-Import Bank of the United States, *Export Finance Solutions for U.S. Businesses* at 3, 5.  Export-credit agencies and suppliers had an interest in U.S. goods and services that might be imported into Brazil for the project, not in U.S. investments in Sete.  These services indirectly benefit Sete's project, but they are not *investment* in Sete.

A second set of evidence the District Court focused on is that some Petrobras advisors brainstormed lists—internally—of potential investors, and those

29

lists included U.S. companies.  JA115 [Op. 19].  But neither EIG nor the District
Court ever cited evidence that those initial brainstorms ripened to Petrobras
courting American investment in Sete or that the brainstorming went anywhere
beyond the whiteboard.  This bears no resemblance to the conduct *Atlantica* found
sufficient to establish jurisdiction.

A third category of evidence the District Court relied on is that Petrobras
accepted invitations to present the project at two conferences held in Brazil, which
were attended by mostly Brazilian investors and some U.S. and other foreign
investors.  JA115-116 [Op. 19-20].  But the fact that Petrobras presented at a
conference in Brazil that U.S. investors were allowed to attend did not mean that
Petrobras was targeting the U.S. investors that happened to be at the conferences or
U.S. investors generally.  In *Atlantica*, the defendant not only directed its
marketing specifically to U.S. investors, it actually marketed *in* the United States
and visited the United States to meet with investors.  813 F.3d at 104, 110-112,
115.  It is not clear how accepting an invitation to present at a conference in Brazil
to mostly Brazilian investors amounts to anything like the targeting in *Atlantica*—
it certainly would not amount to purposeful availment of the United States.  *See
supra* pp. 25-28.  Not to mention that at this very same time, in late 2010 and early
2011, a sophisticated U.S. investor—EIG's Corrigan—understood Petrobras was
not even open to U.S. investment in Sete.

30

A fourth, and final, category of evidence the District Court relied on is that several U.S. companies contacted Petrobras looking to invest in the drillship project. *See* JA116-117 [Op. 20-21]. But those contacts only show that some potential U.S. investors tracked down Petrobras to discuss Sete, just as EIG did.

In sum, none of the categories of evidence the District Court cited add up to targeting by Petrobras and they lack the something more that is found in *Atlantica* and personal jurisdiction cases alike. There was no U.S.-investor focused marketing campaign; Petrobras did not repeatedly initiate contact with U.S. investors, or visit them in the United States to make misrepresentations. Even Sete's first round of financing targeted only Brazilian investors, including some of the largest and most-sophisticated pension funds and investment banks in Brazil. *Supra* p. 8 n.2. The bottom line: Petrobras did not target U.S. investors. It was error for the District Court conclude otherwise.

**B.** **In any case, any targeting of U.S. investors other than EIG is irrelevant because EIG's claims are not "based upon" representations to those investors.**

Ultimately, whether Petrobras targeted U.S. investors other than EIG is irrelevant because EIG's claims are not "based upon" anything Petrobras said or did with respect to those investors. EIG's claims instead are based on the alleged misrepresentations Petrobras made to *EIG*. The District Court never separately addressed the "based upon" requirement, reasoning that its reliance on "Petrobras's

interactions with investors other than EIG supports another element of the jurisdictional inquiry" from *EIG II*: whether Petrobras *targeted* U.S. investors. JA118 [Op. 22]. But *EIG II* did not consider the "based upon" requirement because the requirement was conceded in *EIG II* based on Petrobras's alleged targeting of EIG. 894 F.3d at 345 (citation omitted). The *EIG II* targeting test therefore does not answer the distinct, and necessary, question of whether EIG's claims are "based upon" any Petrobras targeting of other U.S. investors. The answer is no.

     1. The commercial-activity exception applies only where a plaintiff's action is "based upon" the commercial activity in question. 28 U.S.C. § 1605(a)(2). "[A]n action is 'based upon' the 'particular conduct' that constitutes the 'gravamen' of the suit." *OBB Personenverkehr*, 577 U.S. at 35. To determine an action's gravamen, courts "zero[] in on the core of [the plaintiff's] suit," that is, the "wrongful conduct" that "led to [the] injuries suffered." *Id.* Even if certain conduct "led to the conduct that eventually injured the plaintiff" that "does not necessarily make that activity the gravamen of the suit." *Rosenkrantz v. Inter-Am. Dev. Bank*, 35 F.4th 854, 862 (D.C. Cir. 2022) (quotation marks omitted); *cf. Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 169 (2017) (in determining the "gravamen" "[w]hat matters is the crux" of the action).

Once a court identifies the conduct amounting to the gravamen of a plaintiff's claims, it then decides whether that conduct has a sufficient nexus with the United States. *See Global Tech., Inc. v. Yubei (XinXiang) Power Steering Sys. Co.*, 807 F.3d 806, 812 (6th Cir. 2015) ("The commercial activity relied upon by a plaintiff for jurisdictional purposes must be directly connected to the activity for which the plaintiff brings suit.") (citing *Saudi Arabia v. Nelson*, 507 U.S. 349, 359-360 (1993)). The only relevant acts for FSIA jurisdictional purposes are those that form the basis of plaintiff's claims; commercial conduct having a direct effect in the United States is "legally irrelevant" if it does not "form the basis" for the suit. *Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143, 1146 (D.C. Cir. 1994). If a district court does not "undertak[e] an analysis to determine whether a substantive connection or nexus exists," that error requires reversal. *Federal Ins. Co. v. Richard I. Rubin & Co.*, 12 F.3d 1270, 1287-88 (3d Cir. 1993). After all, "[s]uch an undertaking is made necessary by the language of the statute." *Id.*

Consider *Atlantica*, where plaintiffs alleged that defendant made misrepresentations outside the United States over the value of certain securities, and those misrepresentations caused harm to plaintiff-investors who relied on those misrepresentations when deciding to invest. 813 F.3d at 102-104. In considering whether the direct-effects clause applied, the court first determined the gravamen of the suit, which it found to be "straightforward": "Plaintiffs' core claim is that

33

they were misled as to the value" of the securities "by certain misrepresentations made by [defendant].  So the gravamen of Plaintiffs' complaint is those misrepresentations."  *Id.* at 107-108.

*Atlantica* held that the gravamen of the plaintiffs' suit had a sufficient nexus with the United States because the plaintiffs alleged that defendant's misrepresentations caused a direct effect in the United States in the form of loss to some investors, and because plaintiffs alleged their loss resulted from those *same* misrepresentations, which they received.  *Id.* at 110-111.  Indeed, the court went further and clarified that non-U.S. plaintiffs could "premise[] FSIA jurisdiction on the effect that [defendant's] alleged misrepresentations had on non-party United States investors, provided that Plaintiffs could adequately establish the existence of United States investors so affected."  *Id.* at 111.  In other words, it is permissible to breach a sovereign's immunity based on conduct directed toward non-parties only if the plaintiff can demonstrate the same conduct forms the basis for its own cause of action.

Contrast *Atlantica* with *Federal Insurance Co. v. Richard I. Rubin & Co.*, where plaintiffs alleged several tort claims relating to the faulty design, construction, and operation of a building that caused a fire, injuring plaintiffs.  12 F.3d at 1287-88.  The defendant's sole commercial activity that had a direct effect in United States was its financing of a Pennsylvania entity's acquisition of the

building.  *Id.* at 1291.  The court held the commercial-activity exception did not

apply because "the cause of action" and "the legal claims did not arise" from the

loan transaction, meaning that the suit did not have a sufficient jurisdictional

nexus.  *Id.* at 1289-91.  There was, the court explained, no substantive overlap

between the building's defects and the loan, even though the loan constituted

commercial activity in the United States.  *Id.* at 1290-91.

2.  The gravamen of EIG's suit is the misrepresentations Petrobras

supposedly made to EIG to induce it to invest in Sete.  *See Atlantica*, 813 F.3d at

107 (finding gravamen of misrepresentation case to be the misrepresentations).

EIG's claims are not based on anything Petrobras did or said to any other potential

U.S. investor.  JA127-146 [Op. 31-50] (the District Court's centering its analysis

of the fraud claims and Petrobras's duty to disclose around presentations EIG

received and the data room EIG accessed).  The alleged misrepresentations EIG

received were specific to it, consisting of meetings with, phone calls to, and emails

sent to EIG's employees.  *Id.*  Even if other U.S. companies had invested in Sete

and suffered an injury in the United States, that would not make jurisdiction over

EIG's suit proper; EIG still must show that any misrepresentations made to it were

"substantially the same" as those made to and relied on by the other U.S. investors.

*Hood v. American Auto Care, LLC*, 21 F.4th 1216, 1224 (10th Cir. 2021) (holding

exercise of jurisdiction over telemarketer proper where there was no "substantial

relevant difference" between the jurisdiction-nexus conduct and the cause-of-action conduct such that they were "essentially identical").  EIG, in other words, had to "convince the court that it is not relying upon one episode for jurisdiction and another one for its claim."  *Gould, Inc. v. Mitsui Min. & Smelting Co.*, 947 F.2d 218, 221 (6th Cir. 1991).

But that is just what EIG's targeting-of-other-U.S.-investors argument proposes.  There is no evidence that any supposedly targeted potential U.S. investor received the same set of allegedly fraudulent disclosures as did EIG, much less that any other potential investor receiving them actually invested in Sete—based on the disclosures or otherwise.  So even if there were other U.S. investors that could base claims against Petrobras on the same legal theories as EIG—alleged misrepresentations by Petrobras about Sete—that still would not mean their claims and EIG's claims are based on the *same* misrepresentations, gravamen, or commercial activities, as required by the statute.  Simply put, unable to rely on mere allegations at this stage, EIG cannot show that any interaction with other potential U.S. investors "include[s] activity substantially the same as that giving rise to the claim[s]" in this suit.  *Hood*, 21 F.4th at 1225.

3.  The District Court was too quick to brush away this statutory requirement by focusing on *EIG II*.  The based-upon element was not at issue at the motion-to-dismiss phase and was not passed upon in *EIG II*.  894 F.3d at 345.  *EIG II* rested

36

on the allegations in EIG's complaint, which alleged that Petrobras targeted EIG *alone*, and that "[a]t least some of the misstatements and omissions in service" of Petrobras's alleged fraud "took place in the United States." *Id.* at 348; *see Wye Oak Tech., Inc. v. Republic of Iraq*, No. 1:10-CV-1182-RCL, 2022 WL 17820569, at *9 (D.D.C. Dec. 20, 2022) (explaining that these allegations "were essential to the jurisdictional analysis" in *EIG II*).

Discovery, however, revealed facts showing that Petrobras did not target EIG. *See De Csepel v. Republic of Hungary*, 169 F. Supp. 3d 143, 162-163 (D.D.C. 2016) (considering commercial-activity exception anew, despite this Court's prior ruling, because prior ruling "rested" on an inference that, after discovery, "the evidence soundly refutes"), *aff'd in part, appeal dismissed in part and remanded*, 859 F.3d 1094 (D.C. Cir. 2017).  So the District Court this time relied on Petrobras's supposed targeting of *other* U.S. investors for its direct-effects analysis.  JA113-117 [Op. 17-21].  This appeal does not present "jurisdictional facts identical to the ones relied on" by *EIG II* and is therefore not controlled by it.  *McKesson HBOC, Inc. v. Islamic Republic of Iran*, 271 F.3d 1101, 1105-06 (D.C. Cir. 2001), *vacated in part on other grounds*, 320 F.3d 280 (D.C. Cir. 2003).

If the Court finds that Petrobras somehow targeted U.S. investors other than EIG, that targeting still provides no basis to breach Petrobras's FSIA immunity on *EIG's* claims.

## II.    EVEN IF PETROBRAS TARGETED EIG OR OTHER U.S. INVESTORS, ANY EFFECT FELT IN THE UNITED STATES WAS NOT AN IMMEDIATE CONSEQUENCE OF PETROBRAS'S CONDUCT AND THEREFORE WAS NOT A DIRECT EFFECT.

Furthermore, even if Petrobras targeted EIG or other U.S. investors in the relevant sense, discovery has revealed that any losses EIG or others suffered are not a direct effect of that targeting.  A "direct" effect is one that follows "as an immediate consequence of the defendant's activity."  *Weltover*, 504 U.S. at 618 (citation omitted); *Valambhia v. United Republic of Tanzania*, 964 F.3d 1135, 1140 (D.C. Cir. 2020).  It "has no intervening element, but, rather, flows in a straight line without deviation or interruption."  *Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1172 (D.C. Cir. 1994) (citation omitted).  The District Court dismissed Petrobras's direct-effect argument as "essentially a reprise" of Petrobras's motion-to-dismiss arguments.  JA125 [Op. 29].  It was incorrect.  Not only are the standards different at summary judgment, so too were Petrobras's arguments, derived as they were from the actual facts and not EIG's complaint.

1.  Petrobras's argument that there were a variety of superseding events that prevent a finding of direct effects in the United States was not a "reprise" of its

motion-to-dismiss argument.  When moving to dismiss, Petrobras was stuck with the allegations in EIG's complaint.  EIG's allegations included that Petrobras created Sete "for the sole purpose of enticing third party financiers in the United States," JA29 ¶ 1 [ECF No. 11 ¶ 1], so that it could continue its misconduct, and that Petrobras "installed its own former employees—including the architects of Sete and the bribe scheme, Ferraz and Barusco—for the purpose of continuing the corrupt enterprise."  *EIG II*, 894 F.3d at 344 (citation omitted).  Petrobras's motion to dismiss had to accept those allegations as true.  *Id.* at 342 n.1.

At summary judgment, Petrobras was not so constrained.  *See Dominguez v. UAL Corp.*, 666 F.3d 1359, 1362 (D.C. Cir. 2012) (at summary judgment, party cannot rest on "mere allegations") (citation omitted).  Petrobras supplemented and refined its arguments in light of facts revealed during discovery, including undisputed facts that give lie to some of the allegations on which *EIG II* rested.  As the District Court found, discovery showed that "Sete had a valid business purpose," and therefore was not—contrary to the complaint—created with the "sole purpose" of furthering the ongoing misconduct.  JA125 [Op. 27]; JA29 ¶ 1 [ECF No. 11 ¶ 1].  Thus, not everything that Sete did after Petrobras handed off responsibility for its fundraising to Sete was irretrievably tainted.

Moreover, "Ferraz and Barusco were recommended for Sete leadership positions in part due to their business experience," and they were not "installed" by

Petrobras but instead were subject to approval by Sete's shareholders, who could have rejected the two.  JA105, 120, 123 [Op. 9, 24, 27].  Again, Petrobras's actions in appointing Ferraz and Barusco were not indicia of fraud that infected everything else that they did.  Discovery thus revealed superseding acts between when Sete took over the project from Petrobras, when Sete independently decided to allow EIG to invest, and when EIG ultimately invested.  The District Court was accordingly not cabined by this Court's prior FSIA ruling, which relied on allegations and inferences drawn from the complaint, because "evidence soundly refutes" those allegations and inferences.  *De Csepel*, 169 F. Supp. 3d at 162-163.

2.  The connection between Petrobras's conduct and EIG signing the first investment agreement was not immediate.  It instead comprised various independent events that, if they had gone differently, could have prevented EIG's investment.  That connection is far-too-attenuated to amount to a direct effect.

Direct effects flow "immediately" from the foreign-state defendant's conduct; there is no additional step required between conduct and injury, and there is nothing left to chance—the injury flows immediately and inevitably from the conduct.  For example, in *Cruise Connections Charter Management 1, LP v. Attorney General of Canada*, a travel-agency contract required ships be sourced from the United States; there were no independent decisions to be made as to where the ships should be from.  600 F.3d 661, 665 (D.C. Cir. 2010).  So if the

40

travel-agency contract had been fulfilled, U.S.-based ships would have been used and would have produced cruise-related business in the United States.  Breach of that contract therefore had an *immediate* consequence in the United States, and thus a direct effect, when those ships were no longer needed.  *Id.* at 665-666.

By contrast, in *Terenkian v. Republic of Iraq*, the court held that there was no "immediate connection between Iraq's cancellation of the contracts and the failure of oil to reach customers in the United States."  694 F.3d 1122, 1138-39 (9th Cir. 2012).  Although the United States was generally considered to be one of the contract's "intended markets" for the oil, there was no contractual obligation for it to be a market, and, importantly, "[m]any additional steps remained" before that oil could be sold in the United States, including the plaintiffs receiving regulatory permission to receive the oil.  *Id.*

There were numerous "additional steps" here that had to play out after Petrobras's alleged misrepresentations and before EIG could even decide to invest in Sete.  The District Court found that Corrigan, in late 2010, understood that Petrobras was not open to allowing non-Brazilian investors in the project; he believed that EIG would have to convince Petrobras (and later Sete) over time to allow U.S. investment.  JA120-121 [Op. 24-25].  Petrobras handed off control to Sete, and EIG at this time had not yet decided to invest.  What's more, Petrobras had not said it was open to non-Brazilian investors, and when Sete began to run the

41

project independently in early 2011, it closed its first round of financing solely from Brazilian sources.  JA104-105 [Op. 8-9].

Petrobras had temporarily appointed Ferraz and Barusco to their Sete roles in late 2010, but they still had to be voted on and accepted by Sete's Brazilian shareholders, the vast majority of whom were not Petrobras.  JA105 [Op. 9].  Sete hired its own financial advisor separate from the one that had been advising Petrobras.  JA106 [Op. 10].  Then there were months of further communications between Sete and EIG.  And, after continuous outreach from EIG to Sete, including meetings with Sete officers, Sete "eventual[ly] open[ed] up to a foreign investor" and allowed EIG to invest.  JA120 [Op. 24].  EIG, for its part, continued its own diligence during this period of foreign-investment uncertainty, and ultimately approved an investment in Sete.  JA106-107 [Op. 10-11].

Much like in *Terenkian*, where "[m]any additional steps remained" before the effect could be felt in the United States, including having to receive independent approvals, 694 F.3d at 1138-39, it was not inevitable that EIG would invest in Sete as a result of Petrobras's alleged misrepresentations months earlier.  Sete's shareholders could have rejected Ferraz and Barusco's appointments as Sete's officers, and thereby launched Sete in a trajectory entirely separate from Petrobras's supposed influence.  Sete could have simply decided not to allow foreign investment.  Or Sete's new financial advisor could have stepped in and

42

changed the course. Or Sete could have decided to stop engaging in the months of back and forth to assist EIG in its diligence, which perhaps would have turned EIG away from the project.

So what additional steps occurred between Petrobras's initial lack of interest in investment from outside Brazil, and EIG's ultimate investment in Sete? A lot. Not the least of which is that Sete, by the time EIG signed its first investment agreement, was a separately financed, managed, and operating company already invested in by Brazil's largest and most-sophisticated pension funds and investment banks; and *Sete*—not Petrobras—ultimately decided to open up the project to U.S. investment. And it was Sete, not Petrobras, that received EIG's investment. All of these superseding events made the investment agreement anything but an immediate consequence of Petrobras's alleged misrepresentations.

In short, it is unclear how—if Petrobras was not intent on having foreign investors, and Sete opened up to foreign investment only after it began to operate independently—EIG's ultimate investment decision could be an "immediate" and "direct" consequence of any Petrobras interaction with EIG. EIG's due diligence and eventual positive-investment decision was made once Sete itself took over negotiations. The District Court therefore erred in concluding that Petrobras was not entitled to summary judgment on its sovereign immunity defense.

43

**III.    AT THE VERY LEAST, THE COURT SHOULD REVERSE THE DISTRICT COURT'S GRANT OF SUMMARY JUDGMENT TO EIG ON THE MERITS BECAUSE THE DISTRICT COURT CANNOT REACH THE MERITS BEFORE ITS JURISDICTION IS CERTAIN.**

This Court generally will exercise its pendent jurisdiction "when substantial considerations of fairness or efficiency demand it, such as when a non-appealable order is inextricably intertwined with an appealable order." *National R.R. Passenger Corp. v. ExpressTrak, L.L.C.*, 330 F.3d 523, 527 (D.C. Cir. 2003) (quotation marks and citations omitted).  So it is here.  The Court should exercise pendent jurisdiction over the order granting EIG summary judgment because it would achieve efficiency and because the decision on the merits of EIG's claims is inextricably intertwined with the determination of Petrobras's immunity under the FSIA.

One reason courts "do not ordinarily engage in interlocutory review" is because of efficiency: "a verdict rendered after trial could make any review unnecessary." *Rendall-Speranza v. Nassim*, 107 F.3d 913, 916 (D.C. Cir. 1997); *Gilda Marx, Inc. v. Wildwood Exercise, Inc.*, 85 F.3d 675, 679 (D.C. Cir. 1996) (disfavoring exercise of pendent jurisdiction where the issue might well be rendered moot or altered by further proceedings in the district court).  That is not the case here, because the District Court granted EIG summary judgment on the full gamut of liability.  JA177 [Op. 81].  All that is left to decide in the District

Court is jurisdiction and damages. The liability determination therefore will neither be rendered moot nor altered by subsequent litigation in the District Court.

The District Court's grant of summary judgment for EIG on the merits is inextricably intertwined with its sovereign immunity decision. The court "may not rule on the merits" of any claim "without first determining that it has jurisdiction." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430-431 (2007). But the court's denial of Petrobras's summary-judgment motion on FSIA grounds was not a "conclusive determination." *Price v. Socialist People's Libyan Arab Jamahiriya*, 389 F.3d 192, 197 (D.C. Cir. 2004). The District Court's FSIA determination instead was based "on the existing record" and is "subject to change." *Dentons US LLP v. Republic of Guinea*, 410 F. Supp. 3d 194, 206-207 (D.D.C. 2019) (quoting *I.T. Consultants, Inc. v. Republic of Pakistan*, 351 F.3d 1184, 1188 (D.C. Cir. 2003)). The denial of summary judgment for Petrobras simply means it could not establish, on the current record, entitlement to sovereign immunity; it is not a conclusive determination as if EIG had won summary judgment itself. Moreover, the court "may not assume jurisdiction for the purpose of deciding the merits of the case." *Sinochem Int'l Co.*, 549 U.S. at 431. Because the District Court's jurisdiction could not have been settled at this stage, this Court should exercise pendent jurisdiction over and vacate the premature grant of summary judgment for EIG on the merits.

IV.    **THIS COURT HAS JURISDICTION OVER PETROBRAS'S APPEAL BECAUSE PETROBRAS DOES NOT CHALLENGE THE DISTRICT COURT'S FACTUAL DETERMINATIONS.**

EIG moved to dismiss this appeal, contending in part that it "presents no abstract issue of law" that this Court can review on an interlocutory basis under *Johnson v. Jones*, 515 U.S. 304 (1995).  Dismissal Mot. 20-22.  But EIG "misread[s]" *Johnson*.  *Behrens*, 516 U.S. at 312.  "*Johnson* held, simply, that . . . if what is at issue in the sufficiency determination is nothing more than whether the evidence could support a finding that particular conduct occurred," then there is no appellate jurisdiction.  *Id.* at 313.  So, for instance, a defendant like Petrobras may not contest "what occurred, or why an action was taken or omitted." *Ortiz v. Jordan*, 562 U.S. 180, 190 (2011).  But a defendant may argue that "all of the conduct which the District Court deemed sufficiently supported for purposes of summary judgment" nonetheless does not add up to a valid claim.  *Behrens*, 516 U.S. at 313.

That is just what Petrobras does here.  Petrobras does not—given the interlocutory nature of this appeal—challenge the District Court's conclusion that the facts related in its opinion are undisputed for summary-judgment purposes. Rather, Petrobras contends that those facts do not add up to either targeting of U.S. investors or a sufficiently direct effect in the United States under a proper understanding of what constitutes targeting or directness.  Petrobras's arguments

do "require the court to apply law to facts," but that does not put them beyond the scope of a permissible interlocutory appeal. *Jungquist*, 115 F.3d at 1026.

## CONCLUSION

The Court should reverse the District Court's denial of Petrobras's motion for summary judgment and direct that judgment be entered in Petrobras's favor. In the alternative, the Court should reverse the grant of EIG's motion for summary judgment on liability.

Respectfully submitted,

/s/ Sean Marotta

N. THOMAS CONNALLY                SEAN MAROTTA
CHRISTOPHER T. PICKENS            PATRICK C. VALENCIA
HOGAN LOVELLS US LLP              HOGAN LOVELLS US LLP
8350 Broad Street, 17th Floor     555 Thirteenth Street, N.W.
Tysons, VA 22102                  Washington, D.C. 20004
(703) 610-6100                    (202) 637-4881
                                  sean.marotta@hoganlovells.com

June 2, 2023                       *Counsel for Petróleo Brasileiro S.A.*

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the Federal Rule of Appellate Procedure's type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 10,489 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman.

/s/ Sean Marotta
Sean Marotta

**ADDENDUM**

## TABLE OF CONTENTS

**STATUTES:**

28 U.S.C. § 1330 ............................................................................. A1

28 U.S.C. § 1603 ............................................................................. A2

28 U.S.C. § 1604 ............................................................................. A4

28 U.S.C. § 1605 ............................................................................. A5

# 28 U.S.C. § 1330

**28 U.S.C. § 1330.  Actions against foreign states.**

(a) The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement.

(b) Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title.

(c) For purposes of subsection (b), an appearance by a foreign state does not confer personal jurisdiction with respect to any claim for relief not arising out of any transaction or occurrence enumerated in sections 1605-1607 of this title.

A1

## 28 U.S.C. § 1603

## 28 U.S.C. § 1603.  Definitions

For purposes of this chapter—

(a) A "foreign state", except as used in section 1608 of this title, includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).

(b) An "agency or instrumentality of a foreign state" means any entity—

   (1) which is a separate legal person, corporate or otherwise, and

   (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

   (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

(c) The "United States" includes all territory and waters, continental or insular, subject to the jurisdiction of the United States.

(d) A "commercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act.  The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

A2

(e) A "commercial activity carried on in the United States by a foreign state" means commercial activity carried on by such state and having substantial contact with the United States.

## 28 U.S.C. § 1604

## 28 U.S.C. § 1604.  Immunity of a foreign state from jurisdiction

Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

## 28 U.S.C. § 1605

**28 U.S.C. § 1605.  General exceptions to the jurisdictional immunity of a foreign state.**

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

 (1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver;

 (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;

 (3) in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state

A5

and that agency or instrumentality is engaged in a commercial activity in the United States;

(4) in which rights in property in the United States acquired by succession or gift or rights in immovable property situated in the United States are in issue;

(5) not otherwise encompassed in paragraph (2) above, in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to—

  (A) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or

  (B) any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights; or

(6) in which the action is brought, either to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, concerning a

subject matter capable of settlement by arbitration under the laws of the United States, or to confirm an award made pursuant to such an agreement to arbitrate, if

(A) the arbitration takes place or is intended to take place in the United States,

(B) the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards, (C) the underlying claim, save for the agreement to arbitrate, could have been brought in a United States court under this section or section 1607, or (D) paragraph (1) of this subsection is otherwise applicable.

(b) A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which a suit in admiralty is brought to enforce a maritime lien against a vessel or cargo of the foreign state, which maritime lien is based upon a commercial activity of the foreign state: *Provided*, That—

(1) notice of the suit is given by delivery of a copy of the summons and of the complaint to the person, or his agent, having possession of the vessel or cargo against which the maritime lien is asserted; and if the vessel or cargo is arrested pursuant to process obtained on behalf of the party bringing the suit, the service of process of arrest shall be deemed to constitute valid delivery of such notice, but the party bringing the suit shall be liable for any damages sustained by the foreign state as a result of the arrest if the party bringing the suit had actual or

constructive knowledge that the vessel or cargo of a foreign state was involved; and

(2) notice to the foreign state of the commencement of suit as provided in section 1608 of this title is initiated within ten days either of the delivery of notice as provided in paragraph (1) of this subsection or, in the case of a party who was unaware that the vessel or cargo of a foreign state was involved, of the date such party determined the existence of the foreign state's interest.

(c) Whenever notice is delivered under subsection (b)(1), the suit to enforce a maritime lien shall thereafter proceed and shall be heard and determined according to the principles of law and rules of practice of suits in rem whenever it appears that, had the vessel been privately owned and possessed, a suit in rem might have been maintained. A decree against the foreign state may include costs of the suit and, if the decree is for a money judgment, interest as ordered by the court, except that the court may not award judgment against the foreign state in an amount greater than the value of the vessel or cargo upon which the maritime lien arose. Such value shall be determined as of the time notice is served under subsection (b)(1). Decrees shall be subject to appeal and revision as provided in other cases of admiralty and maritime jurisdiction. Nothing shall preclude the plaintiff in any proper case from seeking relief in personam in the same action brought to enforce a maritime lien as provided in this section.

(d) A foreign state shall not be immune from the jurisdiction of the courts of the United States in any action brought to foreclose a preferred mortgage, as defined in section 31301 of title 46. Such action shall be brought, heard, and determined in accordance with the provisions of chapter 313 of title 46 and in accordance with the principles of law and rules of practice of suits in rem, whenever it appears that had the vessel been privately owned and possessed a suit in rem might have been maintained.

[(e), (f) Repealed. Pub. L. 110-181, Div. A, Title X, § 1083(b)(1)(B), Jan. 28, 2008, 122 Stat. 341.]

(g) LIMITATION ON DISCOVERY. —

  (1) IN GENERAL.—

    (A) Subject to paragraph (2), if an action is filed that would otherwise be barred by section 1604, but for section 1605A or section 1605B, the court, upon request of the Attorney General, shall stay any request, demand, or order for discovery on the United States that the Attorney General certifies would significantly interfere with a criminal investigation or prosecution, or a national security operation, related to the incident that gave rise to the cause of action, until such time as the Attorney General advises the court that such request, demand, or order will no longer so interfere.

(B) A stay under this paragraph shall be in effect during the 12-month period beginning on the date on which the court issues the order to stay discovery. The court shall renew the order to stay discovery for additional 12-month periods upon motion by the United States if the Attorney General certifies that discovery would significantly interfere with a criminal investigation or prosecution, or a national security operation, related to the incident that gave rise to the cause of action.

(2) SUNSET.—

(A) Subject to subparagraph (B), no stay shall be granted or continued in effect under paragraph (1) after the date that is 10 years after the date on which the incident that gave rise to the cause of action occurred.

(B) After the period referred to in subparagraph (A), the court, upon request of the Attorney General, may stay any request, demand, or order for discovery on the United States that the court finds a substantial likelihood would—

(i) create a serious threat of death or serious bodily injury to any person;

(ii) adversely affect the ability of the United States to work in cooperation with foreign and international law enforcement agencies in investigating violations of United States law; or

(iii) obstruct the criminal case related to the incident that gave rise to the cause of action or undermine the potential for a conviction in such case.

(3) EVALUATION OF EVIDENCE.—

The court's evaluation of any request for a stay under this subsection filed by the Attorney General shall be conducted ex parte and in camera.

(4) BAR ON MOTIONS TO DISMISS.—

A stay of discovery under this subsection shall constitute a bar to the granting of a motion to dismiss under rules 12(b)(6) and 56 of the Federal Rules of Civil Procedure.

(5) CONSTRUCTION.—

Nothing in this subsection shall prevent the United States from seeking protective orders or asserting privileges ordinarily available to the United States.

(h) JURISDICTIONAL IMMUNITY FOR CERTAIN ART EXHIBITION ACTIVITIES.—

(1) IN GENERAL.—If—

(A) a work is imported into the United States from any foreign state pursuant to an agreement that provides for the temporary exhibition or display of such work entered into between a foreign state that is the owner or custodian of such work and the United States or one or more cultural or educational institutions within the United States;

(B) the President, or the President's designee, has determined, in accordance with subsection (a) of Public Law 89-259 (22 U.S.C. 2459(a)), that such work is

of cultural significance and the temporary exhibition or display of such work is in the national interest; and

(C) the notice thereof has been published in accordance with subsection (a) of Public Law 89-259 (22 U.S.C. 2459(a)), any activity in the United States of such foreign state, or of any carrier, that is associated with the temporary exhibition or display of such work shall not be considered to be commercial activity by such foreign state for purposes of subsection (a)(3).

(2) EXCEPTIONS.—

(A) NAZI-ERA CLAIMS. —Paragraph (1) shall not apply in any case asserting jurisdiction under subsection (a)(3) in which rights in property taken in violation of international law are in issue within the meaning of that subsection and—

(i) the property at issue is the work described in paragraph (1);

(ii) the action is based upon a claim that such work was taken in connection with the acts of a covered government during the covered period;

(iii) the court determines that the activity associated with the exhibition or display is commercial activity, as that term is defined in section 1603(d); and

(iv) a determination under clause (iii) is necessary for the court to exercise jurisdiction over the foreign state under subsection (a)(3).

A12

(B) OTHER CULTURALLY SIGNIFICANT WORKS. —In addition to cases exempted under subparagraph (A), paragraph (1) shall not apply in any case asserting jurisdiction under subsection (a)(3) in which rights in property taken in violation of international law are in issue within the meaning of that subsection and—

(i) the property at issue is the work described in paragraph (1);

(ii) the action is based upon a claim that such work was taken in connection with the acts of a foreign government as part of a systematic campaign of coercive confiscation or misappropriation of works from members of a targeted and vulnerable group;

(iii) the taking occurred after 1900;

(iv) the court determines that the activity associated with the exhibition or display is commercial activity, as that term is defined in section 1603(d); and

(v) a determination under clause (iv) is necessary for the court to exercise jurisdiction over the foreign state under subsection (a)(3).

(3) DEFINITIONS.—For purposes of this subsection—

(A) the term "work" means a work of art or other object of cultural significance;

(B) the term "covered government" means—

(i) the Government of Germany during the covered period;

(ii) any government in any area in Europe that was occupied by the military forces of the Government of Germany during the covered period;

(iii) any government in Europe that was established with the assistance or cooperation of the Government of Germany during the covered period; and

(iv) any government in Europe that was an ally of the Government of Germany during the covered period; and

(C) the term "covered period" means the period beginning on January 30, 1933, and ending on May 8, 1945.

A14

## CERTIFICATE OF SERVICE

I certify that on June 2, 2023, the foregoing was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.

/s/ Sean Marotta
Sean Marotta